UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) 1:18-CR-00155-LEW |
| RYAN D. MERRILL, | ) |
| | ) |
| Defendant | ) |

**DECISION AND ORDER ON
<u>DEFENDANT'S MOTION TO SUPPRESS</u>**

On October 12, 2018, Ryan Merrill was indicted on one count of possession of an unregistered silencer, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, as well as one count of possession of a silencer not identified by a serial number, in violation of 26 U.S.C. §§ 5842, 5861(i), and 5871. Indictment (ECF No. 33). He now moves to suppress evidence gathered from his home on July 17, 2018. Mot. to Suppress (ECF No. 49). The motion is **DENIED**.

**BACKGROUND**

As established in the evidentiary hearing, Merrill resides at 14 Holly Hill Lane in Augusta, Maine. On July 17, 2018, Augusta Police Officers Christopher Hutchings and Todd Nyberg responded to reports of gunshots being fired at the residence. En route, dispatch advised Officer Hutchings that police had been called to Merrill's residence before in response to Merrill firing blank ammunition. Dispatch did not provide any additional information regarding Merrill and neither Officer Hutchings nor Nyberg checked the Augusta Police Department's "In House File" before responding to the call.

Officers Hutchings and Nyberg arrived at Merrill's trailer at nearly the same time.[1] Both were armed and in uniform. Before approaching the front door of the trailer, the officers saw a figure—Merrill—through a large window and motioned for him to come to the door. The officers then climbed the stairs to the deck by the front door and knocked on the door. Officer Nyberg stood behind Officer Hutchings during the initial conversation.

Merrill opened the door. In a relaxed tone, Officer Hutchings asked Merrill whether he had been shooting blanks, to which Merrill responded in the affirmative. When Officer Hutchings requested to see the gun, Merrill told Officer Hutchings that his mother had taken the gun. When Officer Hutchings asked Merrill if he could speak with Merrill's mother, Merrill indicated the gun was in his residence.

At this point, Officer Hutchings said: "I need to see the gun and I will get out of here." Merrill responded by stepping back from the door and stating, "Come on in." After a brief conversation, Merrill directed the officers' attention to a firearm with an attached silencer leaning against the wall in the hallway. Merrill warned that the gun was loaded and after unloading the gun, the officers seized the weapon.

Officer Hutchings testified that throughout the interaction, Merrill's tone remained "relaxed, very cooperative, [and] very understanding." By Officer Hutchings' account, Merrill's demeanor and attitude toward the two officers was "accommodating, hospitable . . . overly friendly and very cooperative, [he] was almost happy to answer our questions."

---

[1] None of the initial interaction between the parties was captured on the officers' recording equipment. As stated in *United States v. Coombs*, this failure to utilize the recording equipment is "unfortunate" because "recording suspects' interviews is a salutary way to eliminate future questions that may arise both about how a particular interview was conducted and about what was said." 857 F.3d 439, 450 (1st Cir. 2017).

Merrill did not appear to be confused and didn't give any indication of mental incapacity. Merrill did ask to take anxiety medicine near the end of the encounter.

Unbeknownst to the officers at the time of their interaction with Merrill, Merrill has a history of mental illness. Six days prior to this interaction, Merrill was released from Maine General Medical Center against medical advice following a two-week involuntary commitment "for evaluation of a manic decompensation with psychotic features." Motion 2; Def.'s Ex. 8.

## DISCUSSION

Merrill argues the Augusta Police Officers violated his rights under the Fourth Amendment by "unreasonably enter[ing] and search[ing] his home, without a warrant, without valid consent, and without exigent circumstances." Motion 5. During the evidentiary hearing, the core of the parties' arguments focused on Merrill's ability to voluntarily consent due to his mental health concerns. Upon questioning by the court at the conclusion of evidence, the issue was more refined; to wit, that Mr. Merrill's mental health made him more susceptible to feeling coerced by the APD officers to agree to enter his residence without a warrant. No claim was made that the officers' search was warranted by exigent circumstances.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477

3

(1971)). However, a warrantless search – even of a home – is not *per se* unreasonable if "proper consent" is "voluntarily given." *United States v. Matlock*, 415 U.S. 164, 165–66 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). Of potential significance here, "where the officer's real objective is search and seizure the householder's consent should not only be clearly voluntary, but also specifically directed toward search and not merely toward entry." *Robbins v. MacKenzie*, 364 F.2d 45, 49 (1st Cir. 1966).

Although Officers Hutchings and Nyberg did not have a warrant to search Merrill's home, my factual findings establish that Merrill, the homeowner, consented to the officers entering his home for the very purpose of seeing the firearm when he said "come on in" and stepped away from his door. Once inside, Merrill directed the officers to the firearm. The parties do not contest whether Merrill expressed his consent[2] and instead focus on whether Merrill's consent was voluntary in light of Merrill's mental illness.

**A. Voluntary Consent**

Whether consent is voluntarily given "turns on an assessment of the totality of the circumstances," particularly the "vulnerability of the consenting party." *United States v. Barnett*, 989 F.2d 546, 554–55 (1st Cir. 1993) (citing *United States v. Mendenhall*, 446 U.S. 544, 557 (1980)). In this assessment, courts in the First Circuit consider "age,

---

[2] In his brief, Merrill offers some argument that "this entry was without voluntary consent," but did not resume this argument in the hearing. Motion 1 (ECF No. 49, #61). Regardless, I credit the officers' testimony on this point.

education, experience, intelligence, and knowledge of the right to withhold consent" as well as more generalized factors such as "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances." *Id.* at 555. The government shoulders the burden of proving by a preponderance of evidence that consent was given knowingly and voluntarily. *Schneckloth*, 412 U.S. at 222; *United States v. Perez-Montanez*, 202 F.3d 434, 438 (1st Cir. 2000).

### 1. *Mental health considerations*

Specific to the issue of mental health, the First Circuit stated that "[a] consenting party's mental frailties may have a bearing upon this analysis," but these "frailties are entitled to little weight in the abstract."[3] *United States v. Coombs*, 857 F.3d 439, 449 (1st Cir. 2017). In order for a defendant's mental illness to tip the scales against a finding of voluntary consent, "there must be evidence of some nexus between, say, the individual's mental condition and the giving of consent, . . . or some evidence that officers obtained consent by exploiting a known vulnerability." *Id.*

In *Coombs*, the First Circuit addressed an appellant's argument that "his history of mental illness—anxiety, depression, and bipolar disorder—vitiated his consent." 857 F.3d at 449. Based on the facts of the case and primarily on the testimony of the police officers indicating that the appellant had remained calm and able to carry on a conversation despite

---

[3] When confronting the question of whether a confession was "voluntary," the Supreme Court stated that while "the mental condition of the defendant" is a "more significant factor in the 'voluntariness' calculus . . . this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

5

being arrested and brought to the ground, the court saw no "nexus between the appellant's psychiatric history and the giving of consent." *Id.* Therefore, the First Circuit upheld the district court's conclusion "that the appellant, even given his afflictions, was not so stressed by the circumstances that his consent could be regarded as either coerced or otherwise involuntary." *Id.* at 449.

Similarly, in *United States v. Grap*, the Seventh Circuit adopted a standard that looks to the presence of "objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given."[4] 403 F.3d 439, 445 (7th Cir. 2005). In the absence of such facts, the Seventh Circuit upheld the district court's conclusion that a third-party was able to voluntarily consent to a warrantless search of her garage despite having been diagnosed with a documented "delusional disorder that impaired her ability to make rational decisions." *Id.* at 441. The court relied on the police officer's testimony that there was "no indication that [the third-party] was suffering from delusional symptoms, or that she was 'out of touch' with reality" and

---

[4] When applying this standard, the court commented that "reasonableness is the touchstone of validity of third-party consent to a search." *Grap*, 403 F.3d at 444. The Seventh Circuit persuasively reasoned:

> The standard of what is reasonably apparent to a reasonable inquiring officer, with its emphasis on the deterrence rationale of the exclusionary rule, is the correct approach. The purpose of suppression of evidence obtained in an unreasonable search is to deter violations by officers of the Fourth Amendment. Obviously, they cannot be deterred by circumstances that are unknown to them, like the psychiatric history of the person consenting to a search. . . . The proper inquiry here focuses upon the objective facts, as presented to a reasonable inquirer, that would reasonably put him or her on notice that a voluntary consent could not be given. . . . And it should not be assumed . . . that anyone suffering from some type of mental disease or defect is inevitably incapable of giving a voluntary consent to a search.

*Id*. at 444-45 (citations omitted).

6

concluded that "however potentially serious the effects of her psychosis, [her] behavior did not indicate that she lacked the requisite mental capacity to consent." [5] *Id.* at 443.

I am persuaded by this line of reasoning and am satisfied that despite Merrill's mental health struggles, his consent was voluntarily given. The record establishes Officers Hutchings and Nyberg were unaware of Merrill's mental illness at the time of their warrantless search.[6] Given the officers' lack of knowledge of Merrill's illness, I find that they did not "obtain[] consent by exploiting a known vulnerability." *Coombs*, 857 F.3d at 449. Furthermore, nothing in their interactions with Merrill indicated he was suffering from a severe mental illness that manifestly would have vitiated his voluntary consent to enter the residence. To the contrary, Merrill's behavior suggests he was understood and was amenable to the police officers' requests. Like the defendant in *Coombs*, Merrill remained calm and carried on a cogent conversation with the officers throughout their interaction. He responded to their questions appropriately, even eagerly.

---

[5] *See also United States v. Mustapher*, 459 F. Supp. 2d 752, 758 (N.D. Ill. 2006) ("Voluntariness is measured by whether a reasonable observer would determine that the consenting person acted voluntarily.").

[6] Defendant argues that although the individual officers had no actual knowledge of his mental illness, the Augusta Police Department had in its possession reports arising from previous interactions with Merrill, including an incident which resulted in Merrill being "blue papered" or involuntarily committed. Defendant contends this information should have been "imputed" to the officers at the scene. I am unaware of cases supporting an extension of the collective knowledge or fellow-officer rule to the context of this case and Defendant's argument, while innovative, is unpersuasive. Even if the collective knowledge of the Augusta Police Department could be imputed to Officers Hutchings and Nyberg, at most, they would have been 'aware' that Merrill had been involuntarily committed and suffered from "mental issues." Def.'s Ex. 1. The Augusta Police Department was not privy to Merrill's medical progress notes and even if it had, its officers were not likely equipped with the training to understand or predict how Merrill's medical diagnosis may, if at all, impact his ability to voluntarily consent. To presume that all suspects with a similarly vague history of mental illness cannot voluntarily consent to a search of the residence is untethered from scientific reason and philosophical notions of free will. More to the point, it is an unworkably paternalistic formulation of constitutional protections, burdening law enforcement officers with an epistemological conundrum far beyond the reach of their training that has never been part of Fourth Amendment jurisprudence.

I see nothing in the record that would have put a reasonable officer on notice that Merrill's underlying mental health conditions precluded him from providing voluntary consent at the time of the officers' search, and Defendant offered no positive evidence to the contrary. *See, e.g., United States v. Reynolds*, 646 F.3d 63, 73-74 (1st Cir. 2011) (similarly relying on external indicators such as testimony that the defendant was "responsive, lucid, and cooperative with the police officers" to conclude that "there was no evidence that [the defendant] was affected by any underlying illness during the time of the search."); *United States v. Coraine*, 198 F.3d 306, 309–10 (1st Cir. 1999) (rejecting the defendant's claim that "an anxiety attack induced him to consent" and relying on external indicators of his ability to consent by stating: "even if [the defendant] had a medical condition that made him susceptible to an anxiety attack, and even if he became somewhat upset at a point during his interrogation, his speech and demeanor appeared to be normal when they asked for permission to search his mobile home"). In short, I see no evidence of a "nexus between the appellant's psychiatric history and the giving of consent." *Coombs*, 857 F.3d at 449.

### 2. *Coercion*

Merrill argues that due to his ongoing mental health issues, he was more susceptible to coercion or more inclined to perceive aggression than the average defendant. Essentially, Merrill argues that he is what we would label in a civil context an "eggshell plaintiff." Motion 6-7. I am not persuaded by this argument. As explained above, I see no nexus between Merrill's mental health condition and his consent. Vague allusions to the historical fact that Merrill was involuntarily committed simply is not enough to

establish a nexus between his diagnosis and consent. There are presumably many mental health diagnoses that do not diminish a person's ability to voluntarily consent. Contrariwise, there may be other mental health conditions that do diminish the ability to consent. Merrill did not offer any evidence that the officers should have known that his particular mental health issues fell into the latter but not the former category. Moreover, it is not clear how the APD officers would have known.

Despite my determination that Merrill's consent was not nullified by his mental illness, as directed by First Circuit precedent, I look to the totality of the circumstances and consider whether Merrill's consent was "obtained by coercive means or under inherently coercive circumstances." [7] *Barnett*, 989 F.2d at 554–55. I find his consent was not coerced.

In this case, the officers never drew their guns or physically threatened Merrill. Merrill was not placed in custody or restrained by the officers. Merrill was not dramatically outnumbered by the officers. Although, as Defendant argues, the officers voiced an imperative by stating they needed to see the gun before leaving, the officers did not threaten force or that they would get a warrant. Even if they had, I am unconvinced such a statement would have risen to a level of coercion that would vitiate Merrill's consent. *See Perez-Montanez*, 202 F.3d at 438–39 ("an officer's statement that he will 'obtain other means' to seize evidence is not the same as saying that he is presently entitled, without the "other means," to the evidence. . . . Nor is there anything false or unduly coercive about a

---

[7] The First Circuit has stated: "In the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness." *United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir. 2000). Although speaking to concerns regarding the voluntariness of post-arrest statements, this logic nevertheless applies in this case.

9

statement of an intention to seek other means to obtain access to property."); *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003) ("[T]he fact that the officers told [the defendant] that they were going to search the apartment regardless of whether she consented because they intended to get a warrant is not inherently coercive.").

The record establishes Merrill gave verbal and physical indications of his consent to the officers entering his home. Once the officers were in his home, Merrill directed their attention to the gun sitting in plain view, warned that the gun was loaded, explained his purpose in having the firearm, offered to "show [the police] forensic evidence of where the rounds struck to assist" in their investigation, and even stated that he "understood before [he] [shot the gun], it was illegal." Gov't Ex. B-1. Merrill's conduct under the totality of the circumstances demonstrates consent free of coercion. *See*, *e.g.*, *United States v. Reith*, 66 F. Supp. 2d 52, 56 (D. Me. 1999) ("Defendant not only led police into the bedroom of his home and pointed out the briefcase containing the gun, but provided police with the combination to the briefcase and warned them to use caution when opening it because the gun might be loaded. Such conduct is strongly indicative of consent."); *United States v. Reynolds*, 2009 WL 1090674, at *6 (D. Me. Apr. 21, 2009), *aff'd*, 646 F.3d 63 (1st Cir. 2011) ("Although the situation may have been inherently coercive, this is not determinative; the fact that [the defendant] immediately responded to [the officer's] question, and volunteered more information than he sought, shows that she was not coerced into doing so.").

*3. Summary*

Although a few factors in the present case run contrary to a finding of voluntary consent—for example, Merrill was not advised that he could withhold consent[8]—the totality of the circumstances militate strongly toward the conclusion that Merrill not only possessed the capacity to consent, but that he in fact voluntarily consented. Thus, I am satisfied the government has met its burden by establishing by a preponderance of evidence that Merrill voluntarily consented to the officers' search of his home.

## CONCLUSION

Because Merrill voluntarily consented to the Officers' search of his home, and the parties offer no argument that the search exceeded the scope of his consent, I conclude that the search was reasonable under the Fourth Amendment.

Defendant Merrill's Motion to Suppress (ECF No. 49) is **DENIED**.

**SO ORDERED.**

Dated this 19th day of February, 2019.

/s/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**

---

[8] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").